Mr. Chief Justice TANEY
 

 delivered the opinion of the court.
 

 ■The question brought before the court by this writ of error depends upon the construction and effect of an get of the General Assembly of Maryland, passed at December session, 1835, entitled “ An act for the promotion of internal improvement.”
 

 The original' charter.of the Baltimore and Ohio Railroad Company authorized it'to.construct a railroad from Baltimore to some.suitable point an the Ohio river, without prescribing any particular route over ■which the road was to pass; leaving the. whole line to the judgment ■and discretion of the company. But by the act above mentioned the state proposed to. subscribe $3,000,000 to its capital stock, provided the company assented to the provisions of that law; and, among Other provisions;^, this acti of.Assembly required the road to pass through Cumberland, Hagerstown, and Boonsborough; and provided also that, if the road was not located in the manner therein
 
 *549
 
 pointed out-, the company “should forfeit $1,000,000,fo the state for'the use of Washington county.”
 

 The towns of Cumberland, Hagerstown, and Boonsbórough,- are all situated in Maryland; the first in Alleghany county and the two latter in Washington.
 

 . This láw was assented to by the company, and became obligatory upon it, and the sum proposed was subscribed by the. state; but for reasons which it is not necessary here to mention, the company did not locate the road through Hagerstown or Boonsborough, nor pqss through any part of Washington, on its way from -Harper’s Ferry to Cumberland, to which point'the road has been made .; and this suit was thereupon brought,, at the instance of the commissioners of Washington- county, in the name- of the state, for the use of the county, to-recover the $1,000,000 above mentioned. After the suit had bée'n instituted, the' state, at December session, 1840, passed a law repealing so much of the act of 1835'as required the company to locate the road through Hagerstown and Boonsborough,-and remitting the forfeiture of the $1,000,000, and directing any suit instituted to recover it to be discontinued.
 

 The commissioners of Washington, county, however, at whose instance the action wás brought, insisted that the money was due to the county by contract, and mat it was not in the power of the state to release it; and upon that ground continued to prosecute.the suit; and the Court of Appeals of the state, having decided against the claim,- the case is brought here by writ of error;
 

 ■■ Undoubtedly, if the money was due to Washington county by .contract, the'act of 1840, which altogether takes away the remedy, would be inoperative and void. But even if the provisions upon this subject in the act of 1835 could be regarded as a contract with the railroad company",'it would be difficult to maintain .that the county was a party to 'the agreement or that it acquired any private or separate interesbunder it, distinct from that of the state. It was certainly at that time the policy of the state to require the road to pass through the places mentioned in the law; and if it failed to- do so, to appropriate tlie -forfeiture, to the use of the county. But it cannot be- presumed that in making this appropriation the legislature was governed merely by a desire to advance the interest of a single county, without any reference to the interests of the rest of the state. On the contrary, the whole scope of the law shows that it was legislating for state purposes, making large appropriations for improvements in different places; and if die policy which at that time induced it to prescribe a particular course for the road,'and in' case it was not followed to exact from the company $1,000,000 .and devote it to the use of Washington county, was afterwards discovered tobe a mistaken one,-and likely'to prove highly'injurious to the rest of the state, it had unquestionably the power to change its policy, and allow the company, to pursue a different course, and to
 
 *550
 
 release it from its obligations both as to the direction of the road and the payment of the money. ' For, ingoing this,, it was dealing altogether with matters of public concern, and interfered-with’ no. private right; for neither the commissioners, nor the county, nor ■ any one of its citizens, had acquired any separate or private interest which could be maintained in-a court, of justice.
 

 . As relates to the commissioners, they are not named m the law, nor were they inymy shapé parties to the contract supposed to have been made, nor is*the money declared to be for' their use. They, are a corporate body, it is true, and. the members who compose it are chosen by the people of the county. But like similar corporations in every other county in the state, it is created for the purposes of government, and clothed with certain defined-and limited powers to enable it to perform those public duties which, according to the laws and usages of the state, are always intrusted to local county 1 tribunals. Formerly they were appointed in all of the counties annually, by the executive department, of the government, and were then denominated the Levy Court of the county; • and in some-of the counties they aré still constituted in that manner, the -legislature commonly retaining the old mode of. appointment, or directing an election by the péople, as the citizens of any particular county may prefer. But, however chosen, theii powérs and duties depend upon , the will of the legislature, ,and are modified and changed, and the manner of their appointment regulated at the pleasure of the’ state. And if this money had been received from the railroad company,' the commissioners, in théir corporate capacity, would hot have beén entitled to it, and eóuld neither have received nor disbursed it, nor. have ’ directed the' uses to which it should be applied, unless the state had seen fit to enlarge, their powers and commit the money to their care; If it was applied to the use of the county,- it did not by any means follow that it was to pass through -their hands,1 arid the mode of application would have depended altogether upon the will of the state. This corporation, therefore,, certainly had no private corporate interest .in the money, and Indeed the suit is not eritered fór their use, but for the usé of- the county. The claim for the county is equally untenable with that of the commissioners. Thé several counties are- nothing more than certain portions of territory into which the state is divided for the more convenient-exercise-of the powers of government.. .They form together one-political body - in which the sovereignty resides.. And in passing the law of 1835, the people of Washington county did -not and could not act as a community having separate and distinct interests of their own, but •as a portion of the sovereignty; their delegates to the General Assembly acting in conjunction with the delegates'from every other part of the state, and legislating for public and state purposes, and the validity of the law did not- depend upon their assent to its provisions,' as it would have been- equally obligatory upon them,-if
 
 *551
 
 every one of-'their delegates had voted against it, provided -it was passed by a constitutional majority of the General Assembly. And whether the money was' due by contract or otherwise, it must, if received and applied to the use of. the county, have yet been received and -applied- by the state to public purposes in the county. For the county'has no separate and corporate, organization by which it could receive the money or designate agents to receive it or give an acquittance to the railroad company, or determine -upon the uses to which it should be appropriated. We have already seen that .the corporation of commissioners of the county had no such power ; and certainly-no citizen of the county had any private and •individual property in it. It must have rested with the state so to dispose of it as to promote the -general interest of the whole community, by the advantages it bestowed upon this particular portion of it.
 

 . Indeed) if this money is to be considered as due, either to the commissioners or-to the county, by contract' with the railroad company, so that it may be recovered in this suit, in opposition to the will and policy of the state, it would follow necessarily that it might have ■been released by the party entitled, even if the state had desired to enforce it. -And if the state hád adhered to the policy of .the act'in question, and .supposed it to be for the public interest to insist that the road should pass along the line prescribed in that law, or the company be compelled to pay the million of' dollars, according to the constru’c'tion now contended for, the commissioners or the county might have counteracted the wishes of the state, and, by releasing the- company from the obligation to pay this money, allowed them to locate-the' road qpon any other line. And if the construction of the plaintiff in error be right, the legislature of Maryland, in a case where the whole people of the state had become so deeply concerned by the large amount subscribed to the capital stock of the road, that its success or failure' must seriously affect the interests of every part of the state; and where the improvement was regarded as of die highest importance to its general commercial prosperity; it deliberately deprived itself of the power of exercising any future control over it, and left it to a single county or county corporation to decide upon the course of the road, and either to insist on the line prescribed by the legislature, or to release the company from the obligation to pursue it, without regard to the wishes or interest of the rest of the state. Whether the million -of dollars was reserved bj contract, or inflicted as a penalty, such a construction of the law cannot be maintained.
 

 ■ But we think it very clear that this was a penalty, to be infficted if the railroad company did not follow the line pointed out in die law. It is true,' that the act of 1835, which changed in some important particulars the obligations' imposed by the original charter, would npt have been binding on the company without its consent; and the'1st section, therefore, contains a provision requiring the
 
 *552
 
 consent of the company,in order to give it validity.. And when the • company assented to the proposed alterations in their charter, ¿nd ■agreed to. accept the law, it undoubtedly became a contract between it and the state; but it was a contract in no other sense than every-charter, whether original | or supplementary, is a contract, where rights of private'property are acquired under it. Yet, although this supplementary charter was á contract in this sense of the'term, it does.not by any means follow that'the legislature might not, in the charter,, impose duties and obligations 'upon the company, and inflict penalties-and forfeitures as a punishment-for its disobedience, which might be enforced against it in' the form of criminal proceedings, and 'as the punishment of an offence- against the law. . Such penal provisions are to be found in many charters-, and we are not aware of any- case in which they have been held to be mere matters of contract. \ -And in the case before.Jh’e court,.the language of the . law requiring the company to locate the road so as to pass through the places therein mentioned, is certainly not the language of contract, but is evidently mandatory, arid in the exercise of. législative power; and it is made the duty of the company, in.case they assent, to the provisions of that law,.-to pasS through Cumberland, Ha-gerstown, and Boonsbbrough; and if they fail to do so, the fine of $1,000,000, is imposed- as a punishment for the offence. And a provisión, as in this case, that the party shall forfeit a particular sum, in case he does mot- perform an act required by law, has always, in the construction of-statutes, been-regarded not as a,contract with the delinquent party, but as'the punishment.for an offence. Undoubtedly, in .the ease of individuals, the word forfeit is construed to be the language of contract, becáuse contract is the only mode in which one person, .can become liable to pay-a penalty to another for a breach of duty, or the' failure to 'perform an obligation. In légis- ■ lative proceedings, however, the construction, is otherwise,' and a •forfeiture is always to be regarded as a punishment inflicted for a violation of somé duty enjoined upon the party by law; and such, very clearly, is the meaning of the word in the act in question.
 

 In this aspect of the case, and upon this construction of the act of Assembly, we do not understand that the right of the state to release it is disputed. Certainly the power to do so is too well settled to admit of controversy. The repeal of thé law imposing the penalty, is of itself a remission. 1 Cranch, 104; 5 Cranch, 281; 6 Cranch, 203, 329. And in the cáse of the United States v. Morris, 10 Wheat. 287, this court held, that Congress had clearly the power to authorize the secretary of the Treasury to remit any penalty or.,, forfeiture incurred by the breach of the revenue laws, either before or after judgment; and if remitted'before the money was actually paid, it embraced the shares given by law in such cases to the officers .of the customs, as-well as the share of the United-States* ■ The right to re- . mit a penalty like this stands upon the same principies; ■
 

 
 *553
 
 We are, therefore, of opinion, that the law of 1840, herein before • mentioned, did not impair the obligation of a contract', and that the ■ judgment of the Court of Appeals of Maryland must be affirmed.