STATE of South Dakota ex rel. Larry VAN EMMERIK and all others similarly situated, Petitioners,

v.

William J. JANKLOW, Governor of South Dakota; Mark V. Meierhenry, Attorney General of South Dakota; David Volk, Treasurer of South Dakota; and R. Van Johnson, Secretary of Revenue of South Dakota, Respondents,

and

Black Hills Power and Light Company; Northern States Power Company; Montana-Dakota Utilities Company; Otter Tail Power Company; Northwestern Public Service Company; and Iowa Public Service Company, Parties Respondent added by Supreme Court.

No. 13354.

Supreme Court of South Dakota.

Argued Feb. 19, 1981.

Decided April 15, 1981.

Rehearing Denied May 19, 1981.

George A. Bangs of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, and Gale E. Fisher, Sioux Falls, for petitioner Van Emmerik.

Mark V. Meierhenry, Atty. Gen., Pierre, for respondent State Officials; John P. Dewell, Asst. Atty. Gen., Pierre, on the brief.

Brent Wilbur of May, Adam, Gerdes & Thompson, Pierre, for respondent Investor-owned Utilities.

Alan F. Glover of Denholm & Glover, Brookings, for amicus curiae South Dakota Rural Electric Assn.; Leo P. Flynn, Milbank, Vincent J. Protsch, Madison, on the brief.

Robert B. Frieberg of Frieberg, Frieberg & Peterson, Beresford, for amicus curiae South Dakota Municipal Electric Assn.

J. W. Grieves of Grieves & Rahn, Winner, for amicus curiae Rosebud Electric Cooperative, Inc. and Cherry-Todd Electric Cooperative, Inc.

FOSHEIM, Justice.

This is an original proceeding in which petitioner seeks writs of prohibition and mandamus. We deny the writs sought and quash the alternative writ of prohibition previously issued.

The present case has its origins in litigation commenced by petitioner in 1979. Petitioner originally instituted a class action seeking a one percent refund of sales taxes from the State of South Dakota and from all retailers engaged in the sale, furnishing or service of gas, electricity or water since January 1, 1976, which petitioner claimed were collected in excess of the rate imposed by SDCL 10-45-6. The utility companies eventually moved to dismiss because they had commenced an administrative action in June of 1979, seeking a similar one percent sales tax refund. Thereafter, petitioner moved to consolidate his action with the appeal taken to circuit court by the investor-owned utilities in the related administrative action following the denial of their applications for sales tax refunds by the Secretary of Revenue. On February 20, 1980, the circuit court rendered judgment denying the relief sought in the investor-owned utilities case. Subsequently, on April 1, 1980, the court entered an order dismissing petitioner's complaint based upon its determination in the related case that the State had not collected a sales tax in excess of that imposed by statute.

Petitioner and the investor-owned utilities then took separate appeals to this Court. In the appeal of the investor-owned utilities, we concluded that the sales tax rate imposed by SDCL 10-45-6 was three percent and that the State had, since 1969, collected a sales tax in excess of the amount

imposed by statute. We accordingly reversed and remanded for determination of a credit or refund to be adjusted in favor of the utilities pursuant to the provisions of SDCL 10–45–53. *See In the Matter of the Appeal of the Sales Tax Refund Applications of Black Hills Power and Light Co.*, 298 N.W.2d 799 (S.D.1980). Petitioner's appeal was decided the same day. In that case, we held that, due to the doctrine of sovereign immunity, petitioner had no standing to seek a refund from the State either as a representative of his class or in his individual capacity. At the same time, we determined that petitioner was entitled to proceed against the utilities to seek relief derivative of any remedy adjusted in favor of the utilities in the related litigation. *See Van Emmerik v. State*, 298 N.W.2d 804 (S.D.1980).

Following remand, and during the pendency of circuit court hearings in the two cases, the 1981 Legislature enacted Senate Bill 40, entitled "An Act to provide for a retroactive and prospective sales tax increase on utility services, amusements and athletic events; to allow credit for taxes already paid, to validate and ratify the collection of prior taxes, and to declare an emergency."

Section 1(1) of the act provides that "[a]t all times since July 1, 1969, and until May 1, 1980, §§ 10–45–6 [dealing with the rate of tax imposed upon the gross receipts from sales of utilities] and 10–45–8 [dealing with the rate of tax imposed upon the gross receipts from sales related to amusements and athletic events] as heretofore existing in the statutes of this State were intended by the Legislature to apply the same rates of tax as applied by § 10–45–2 [which imposed a tax of four percent upon gross receipts from sales of tangible personal property] . . . ."

Section 2 of the act specifically amends SDCL 10–45–6 to provide a four percent rate of tax upon sales of utility services, and Section 5 makes Section 2 effective retroactively from May 1, 1980, to July 1, 1969, and prospectively to commence when a tax increase levied by 1980 S.D.Sess.L., ch. 325 is removed.[1]

Section 3 of Senate Bill 40 amends SDCL 10–45–6 to impose a five percent rate of tax upon utilities sales, and Section 6 renders Section 3 effective retroactively from "the effective date of this Act" to May 1, 1980, and prospectively from "the effective date of this Act" until the tax increase levied by the 1980 Legislature is removed.[2]

Section 8 of Senate Bill 40 protects retailers who may not have collected the full amount of the tax from their customers.[3] It provides that the retroactive taxes are effective only to the extent that taxes were theretofore actually collected by the retailer, and also provides that any tax previously paid under §§ 10–45–6 and 10–45–8 shall be credited to the taxes imposed by Sections 2, 3, and 4 of Senate Bill 40.

Section 9 of the act ratifies and validates the collection of taxes effectuated prior to passage of the act. Section 10 contains a severability clause and Section 11 declares an emergency to exist.

The act was passed by the Legislature, and thereafter approved by the Governor on January 30, 1981, as an emergency act in full force and effect as of that date. On that same day, petitioner instituted this original proceeding, challenging the constitutionality of Senate Bill 40 and seeking

---

1. The 1980 Legislature raised certain sales, excise, and use taxes to fund the purchase of a state rail line. The Legislature directed that those 1980 tax increases be repealed as of July 1, 1981 or when the revenue raised thereby is sufficient to repay all obligations incurred by the South Dakota Railroad Authority. See 1980 S.D.Sess.L., ch. 325, § 22.

2. Section 4 of the act amends SDCL 10–45–8 to raise the sales tax on sales related to amusements and athletic events to four percent. Section 7 makes Section 4 retroactive to July 1, 1969.

3. The retail sales taxes involved here are the liability of the retailer and not the ultimate consumer. *See Van Emmerik v. State*, supra. SDCL 10–45–27. While it is true that the tax is likely passed on to the consumer under SDCL 10–45–22, the retailer may, without so advertising, simply fail to add the tax.

writs of prohibition and mandamus to restrain the State from enforcing or attempting to implement Senate Bill 40 and to order payment of refunds for excess sales taxes paid to the State. On February 3, 1981, we granted an alternative writ of prohibition ordering that the State desist and refrain from acting pursuant to Senate Bill 40 until further order of this Court.

■ Our analysis of petitioner's attack upon the validity of Senate Bill 40 begins with the recognition that statutes are presumed to have prospective application and may be construed as retroactive only when such intention plainly appears. SDCL 2–14–21; *Johnson v. Kusel*, 298 N.W.2d 91 (S.D.1980); *In re Scott's Estate*, 81 S.D. 231, 133 N.W.2d 1 (1965); *Bahlkow v. Preston*, 60 S.D. 151, 244 N.W. 93 (1932). There is no question here that Senate Bill 40 is expressly meant to be retroactive in much of its operation and must be construed as having such effect. We thus proceed directly to address the constitutional claims asserted by petitioner.

Petitioner recognizes that the mere fact of retroactivity is not sufficient in itself to establish the unconstitutionality of a statute. *See Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *Hodges v. Snyder*, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923); *United States v. Heinszen & Co.*, 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098 (1907); *Alatalo v. Shaver*, 45 S.D. 163, 186 N.W. 872 (1922). Petitioner contends, however, that Senate Bill 40 constitutes a taking of property without just compensation in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Art. VI, § 13 of the South Dakota Constitution. It is argued that the act unlawfully deprives petitioner of his right to recover from the utilities (for sales tax overcharges passed on by the retailers) as a result of this Court's determinations, in *Matter of Black Hills Power and Light*, supra, and *Van Emmerik v. State*, supra, that the utilities were entitled to a credit or refund as a result of the sales tax overcharge at issue in those cases, and that petitioner was entitled to seek relief from the utilities.

The validity of retroactive statutes, including those imposing retroactive taxes, has been challenged on many occasions in the courts of this nation. A review of United States Supreme Court decisions involving retroactive legislation does not reveal inflexible rules or immutable patterns of due process analysis with respect to such legislation. Rather, it is clear that the constitutionality of a retroactive statute depends upon a broad variety of policy considerations couched within a due process framework.

Senate Bill 40 expressly purports to ratify the unauthorized collection by state officials of sales tax overcharges and to that extent, the law is a curative act. The two leading cases in this area are *United States v. Heinszen & Co.*, supra, and *Forbes Pioneer Boat Line v. Board of Commissioners*, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922). Petitioner relies heavily upon *Forbes*, which involved the collection of tolls at a canal operated by the State of Florida. The Board of Commissioners, the agency charged with responsibility for maintenance of the canal, collected tolls for passage from the plaintiff, which sued for a refund. On the same day that the Florida Supreme Court held that the Board was not empowered to collect the tolls, the Florida Legislature passed a statute providing that all previously collected tolls were legalized and validated. The Florida Supreme Court upheld the validity of the statute, but was reversed by the United States Supreme Court, which remarked:

> To say that the Legislature simply was establishing the situation as both parties knew from the beginning it ought to be, would be putting something of a gloss upon the facts. We must assume that the plaintiff went through the canal relying upon its legal rights and it is not to be deprived of them because the Legislature forgot.

258 U.S. at 340, 42 S.Ct. at 326, 66 L.Ed. at 649.

*United States v. Heinszen & Co.*, supra, involved the right of the Philippine govern-

ment to retain import and export duties, collected without authority, pursuant to an act of Congress that subsequently confirmed the collection. In 1898, after the Philippine Islands came under United States military control, a tariff went into effect pursuant to a presidential order. In 1899, the Spanish-American War was ended by treaty and collections continued under the same tariff. In 1902, an Act of Congress continued the original tariff in force. The Supreme Court subsequently held that the President, as Commander-in-Chief, had authority to impose the tariff until the treaty of peace was ratified but that, after ratification, the authority had to come from Congress. Thus, between 1898 and the 1899 treaty ratification, the tariff was properly collected, just as it was following the 1902 Congressional action. However, between 1899 and 1902, there existed no authority for the collection. Congress accordingly enacted a statute in 1906 that purported to legalize and ratify the prior invalid collections.

The validity of the 1906 legislation was then attacked, and the United States Court of Claims refused to give effect to the statute. The Supreme Court reversed, stating that Congress, as well as the legislature of any state, may

> 'cure irregularities, and confirm proceedings which without the confirmation would be void, because unauthorized, provided such confirmation does not interfere with intervening rights.'

206 U.S. at 384, 27 S.Ct. at 746, 51 L.Ed. at 1103, quoting *Mattingly v. District of Columbia*, 97 U.S. (7 Otto) 687, 690, 24 L.Ed. 1098, 1099 (1878).

A superficial examination of the similarities between *Forbes* and *Heinszen* suggests some measure of irreconcilability in the results reached in the two decisions. In both cases, governmental officers charged with administering a program illegally collected certain fees in the belief that they were so authorized. In both, there were subsequent judicial decisions holding that the collections were unauthorized and that the payors were entitled to refunds. Finally, in both cases, as a result of the litigation, retroactive legislation followed, purporting to ratify the prior unauthorized collections.

Petitioner, relying upon *Washington National Arena Ltd. Partnership v. Treasurer*, 287 Md. 38, 410 A.2d 1060 (1980), cert. denied, —— U.S. ——, 101 S.Ct. 106–07, 66 L.Ed.2d 40 (1980), argues that the significant area of difference between *Forbes* and *Heinszen* lies in the existence of a controlling statute or expression of legislative policy contrary to the unauthorized actions of the governmental officials. That distinction, however, requires qualification, for in neither *Forbes* nor *Heinszen* was there any legislative enactment that bestowed upon the government officials the authority to collect the taxes in question. In *Forbes*, there had never existed *any* authority for the levy of tolls by the Florida Board of Commissioners. *See Forbes Pioneer Boat Line v. Board of Commissioners*, 77 Fla. 742, 82 So. 346 (1919). In other words, it could not be said that the Florida Legislature 'simply was establishing the situation as both parties knew it ought to be,' and it was thus impermissible for the Florida Legislature to ratify the imposition of a tax upon an event that was completely tax-free at the time of its occurrence. In *Heinszen*, on the other hand, the illegal tariff collection followed a period of authorized collection and was thus effected with at least some color of authority. The collection did not contravene a clear expression of policy that such type of tax was not to be imposed.

*Forbes* does not represent a departure from *Heinszen*, as is clear from the Court's approving citation of *Heinszen* for the proposition that the governing body can "ratify the collection of a tax that had been made without authority of law." *Forbes*, 258 at 339, 42 S.Ct. at 325, 66 L.Ed. at 648. Neither, in our opinion, does *Forbes* militate against a finding that Senate Bill 40 is constitutionally valid. It has been the legislative policy of this state since 1935 that the gross receipts from sales of utility services should be subject to the imposition of sales taxes. *See Matter of Black Hills Pow-*

*er & Light,* supra. Thus, when the South Dakota Department of Revenue exacted a sales tax one percent higher than that authorized by statute (which action the Legislature purported to ratify by Senate Bill 40), it did so with some measure of ostensible authority. As stated in *Heinszen:*

> That where an agent, without precedent authority, has exercised in the name of principal a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement.

206 U.S. at 382, 27 S.Ct. at 745, 51 L.Ed. at 1102. Unlike *Forbes,* the present case involves an increase in the rate of an authorized tax category rather than the imposition of a tax upon a transaction that was not subject to any tax when consummated.

■ As noted earlier, no precise guidelines exist that state with certainty when a particular retroactive tax law can be upheld. In each case, "it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation." *Welch v. Henry,* 305 U.S. at 147, 59 S.Ct. at 126, 83 L.Ed. at 93. Petitioner's contention that Senate Bill 40 is unduly harsh and oppressive essentially stems from the fact that, prior to the law's enactment, decisions had been rendered by this Court that established certain rights with regard to the unauthorized collection of sales taxes (in the seminal *Matter of Black Hills Power and Light* and *Van Emmerik v. State* cases). Petitioner claims that Senate Bill 40 has thus impermissibly stripped him of an absolute, vested right to recover for the sales tax overcharges that the act attempts to ratify. We disagree.

■ Even if it is assumed that petitioner's right to recover was in some sense vested, that right is nevertheless subject to the equities existing against it. *United States v. Heinszen & Co.,* 206 U.S. at 386–87, 27 S.Ct. at 747, 51 L.Ed. at 1104. It is apparent here that petitioner's asserted right is not based on any substantial equity. The unauthorized tax had been mistakenly collected without interruption since 1969 and petitioner presumably shared in whatever public benefits the tax funded. Where an asserted vested right that is not linked to any substantial equity arises from the mistake of officers purporting to administer the law in the name of the State, the Legislature is not prevented from curing the defect in administration simply because the effect may be to destroy claims that would otherwise exist. *Graham & Foster v. Goodcell,* 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415 (1931). This principle explains the decisions validating statutes depriving persons of rights established by unexpected interpretations given to the statutes by the courts. *See, e. g., Seese v. Bethlehem Steel Co.,* 168 F.2d 58, 64 (4th Cir. 1948) (sustaining an act that destroyed an estimated five billion dollars in claims resulting from the Supreme Court's interpretation of federal legislation in another case); *see also* Hochman, C., The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692, 720–22 (1960). When the sales taxes were improperly exacted in the instant case, the Legislature undoubtedly possessed the power to authorize their imposition in the manner in which they were enforced and hence, from the very moment of their collection, a right in the Legislature to ratify the transactions was engendered. *United States v. Heinszen & Co.,* supra. Petitioner (having shared in the benefits funded by the tax) effectively seeks a windfall in claiming that a vested right has arisen here since, had the official action in question had the effect it was intended to and could have had, no such right would have arisen.

■ The fact that rights modified by a retroactive statute have been asserted in litigation prior to the passage of the statute is not without significance, *Western Union Telegraph Co. v. Louisville & Nashville Ry.,* 258 U.S. 13, 42 S.Ct. 258, 66 L.Ed. 437 (1922) (dictum), and it is plain that the Legislature cannot deprive a person of money actually

received under a judgment antedating the legislation. *Maryland v. Baltimore & Ohio Ry.,* 44 U.S. (3 How.) 534, 11 L.Ed. 714 (1845) (dictum). The litigation in the cases that gave birth to the present action is currently pending at the circuit court level pursuant to this Court's directions. The existence of pending litigation, however, is not controlling. *See Hodges v. Snyder,* supra; *Cf. Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). In *Van Emmerik v. State,* supra, at 807, we stated that "[e]vidence that the one percent excess tax was actually shifted to the customer is, of course, an essential element of proof." Petitioner does not represent here that such a showing has, in fact, been made, nor does he assert that there is a final, unreviewable determination concerning his rights flowing from the seminal litigation.[4] *Cf. Chase Securities Corp. v. Donaldson,* supra. Neither has petitioner demonstrated any substantial change of position in reliance upon our decisions in the related litigation.

■ A related consideration involves the extent to which petitioner changed his position in reliance upon SDCL 10–45–6 as it existed prior to the passage of Senate Bill 40. An important element involved in many cases involving retroactive taxation is the ability reasonably to foresee, at the time of the transaction in dispute, that a tax would be imposed, and the probability that any conduct would have been altered to avoid it. *Welch v. Henry, supra; Milliken v. United States,* 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931). This factor, however, typically bears relevance where an altogether new, affirmative tax is imposed upon a prior transaction that, had the tax been foreseen, might not have been consummated in order to avoid the liability created by the tax. The tax at issue in the present case could not have been avoided through an altered course of conduct in the same manner that income taxes or estate and gift taxes might be avoided through alternative methods of financial and estate planning.[5] *Cf. Welch v. Henry,* supra, and cases discussed therein. For this reason, petitioner's further claim that Senate Bill 40 is invalid due to its eleven and one-half year period of retroactivity also lacks merit. The temporal reasonableness of the retroactivity is relevant in a due process context insofar as it pertains to the element of foreseeability which would have allowed a party to a previously untaxed transaction to alter his conduct to avoid imposition of a retroactive tax. The obvious reason for this concern is rooted in the principle that a person should be able to plan his conduct with reasonable certainty of the legal consequences. *See* Hochman, C., supra. As noted above, that principle is not threatened here.

■ Petitioner also contends that Senate Bill 40 violates Art. I, § 10 of the United States Constitution and Art. VI, § 12 of the South Dakota Constitution because it impairs the utilities consumers' contractual right to be charged by the utilities retailers at the established rate plus lawful sales tax. Initially, it must be noted that the Contract Clause of the federal constitution is not a specific, particularized, absolute, or unqualified prohibition to be read with the literal exactness of a mathematical formula. Rather, it is general in nature, affording a broad outline and requiring construction with a view toward the circumstances surrounding its invocation. *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). So also, in our opinion, must the comparable South Dakota provision be construed. We accordingly take cognizance that, although the contract clauses are phrased in absolute terms, in many cases the sanctity of contract must be balanced with other equally compelling factors. Moreover, it appears that the standard of reasonableness under the Contract Clause that should be utilized here coalesces in some degree with that

---

4. Petitioner conceded in oral argument that no final, enforceable judgment in his favor exists.

5. It is hence fair to say that Senate Bill 40, in a practical sense, operates to effectuate the intentions of the affected parties as they existed when the tax was collected.

utilized in determining the validity of retroactive legislation in a due process framework. *Home Building & Loan Association v. Blaisdell,* supra, at 447, 54 S.Ct. at 243, 78 L.Ed. at 434; *See* Hale, R., The Supreme Court and the Contract Clause, 57 Harv.L. Rev. 852 (1944); *See also Veix v. Sixth Ward Building & Loan Association of Newark,* 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). Much of what we have said herein with regard to the due process attack upon Senate Bill 40 thus applies with equal force to the challenge based upon the contract clauses.

██ That the act might affect private rights in an effort to achieve a balance in the public interest does not render the act infirm. *See Home Building & Loan Association v. Blaisdell,* supra; *Cf. FHA v. The Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958). To accept petitioner's argument would mean that while the State exercises sovereign immunity beyond the three-year limitation of SDCL 10–45–53 for erroneously imposing a sales tax, the conduit (utility) of that tax bears full exposure to the consumer (petitioner) for the overpayment passed on, even though the conduit not only retained nothing therefrom, but actually bore the administrative expense to collect and remit the tax. Conversely, the consumer who ostensibly shared in whatever benefit the tax funded could nevertheless effect a full refund from the conduit, but nothing directly from the sovereign that erroneously imposed and received it. Insistence that retailers assume such a risk, whether pursuant to an express or an implied contractual obligation, would be patently unreasonable.[6] It is fundamental to recognize that any contract between the utilities and their consumers concerning charges for sales tax is necessarily made with reference to the taxing power of the State. We emphasize that the prior illegal collection of the tax did not arise from an inherent want of power in the State, but simply from the failure to delegate to the Department of Revenue the authority essential to give immediate validity to its actions. *See United States v. Heinszen & Co.,* supra.

We have reviewed petitioner's remaining arguments and find that they are either without merit or unnecessary to address in view of the conclusions we have reached. The alternative writ of prohibition is quashed[7] and the petition for permanent writs of prohibition and mandamus is dismissed.

WOLLMAN, C. J., and MORGAN, J., concur.

DUNN, J., concurs in part and dissents in part.

HENDERSON, J., dissents.

DUNN, Justice (concurring in part, dissenting in part).

I cannot entirely agree with the majority opinion as written.

From an analysis of the various Supreme Court decisions, I do however agree that the legislature can pass a retroactive increase in tax to cover refunds ordered paid in *Matter of Sales Tax Refund Applications,* 298 N.W.2d 799 (S.D.1980). As I understand these cases, the bottom line tests are whether: 1) a vested right has been taken away by the retroactive legislation; 2) the retroactive increase has a limitation in time which is reasonable and therefore not lacking in due process; 3) the validation of the

---

**6.** We also reject petitioner's claim that Senate Bill 40 grants a special immunity in violation of Art. III, § 23(9) of the South Dakota Constitution. The legislation does not grant an immunity to any single retailer but is applicable in its terms to a broad class of retailers. *Cf. Bon Homme County v. Berndt,* 13 S.D. 309, 83 N.W. 333 (1900).

**7.** The order quashing the alternative writ of prohibition shall be effective May 1, 1981. In so ruling, we have not overlooked SDCL 15–25–3, which provides that a party may file a petition for rehearing within twenty days after a decision has been rendered in an original proceeding in this Court. Any liability determined to exist in the event a rehearing is granted and our decision as expressed in this opinion is modified or reversed is an issue that can be resolved at such time as it arises.

tax would not have harsh and oppressive results; and, 4) finally, that the validation would be in the public interest.

We previously held that Van Emmerik had no direct right to refunds of the tax from the State on the grounds of sovereign immunity, *Van Emmerik v. State*, 298 N.W.2d 804; however, he now claims a vested property right in refunds ordered paid by the State to the Utilities. *Matter of Sales Tax Refund Applications*, supra. His claim is made on the basis of his derivative rights to receive any refund due him from any amounts paid by the State to the Utilities. The State is only liable for refunds to the Utilities for the years subsequent to 1976 under SDCL 10–45–53. Therefore, the question becomes whether Van Emmerik can complain that Senate Bill 40 would retroactively validate a tax back to 1976. In the first place, Van Emmerik has a very tenuous claim of a vested property right in a portion of these refunds to the Utilities. There is certainly no final judgment in his favor. He must await the refund before he has any claim to a portion of it. His claim simply has not ripened into a vested right and is presently pending in circuit court. As aptly stated in *Hodges v. Snyder*, 45 S.D. 149, 157, 186 N.W. 867, 870 (1922), quoting from 2 Lewis' Sutherland, Statutory Construction 1237:

> "It is no objection to a curative act that it validates what has previously been declared invalid in a judicial proceeding. The judgment may furnish the occasion for the act. Of course, the Legislature cannot annul or set aside the judgment of a court, but it may remove a defect from which the judgment proceeded."

Therefore, as long as Van Emmerik's claim has not ripened into a vested right, the legislature could validate the tax that the judgment of the court found invalid in *Matter of Sales Tax Refund Applications*, supra. This retroactive tax would only go back three years which is a reasonable time and not violative of due process as indicated in *Comptroller of Treasury v. Glenn L. Martin Co.*, 216 Md. 235, 140 A.2d 288 (1958).

In any event, the amount eventually due to Van Emmerik would be a trifling sum, which has been paid into the state treasury and used to provide services that Van Emmerik and all other citizens and utility consumers have enjoyed. *Alatalo v. Shaver*, 45 S.D. 163, 186 N.W. 872 (1922), would therefore lend a further ground for sustaining a retroactive tax, for a reasonable time limitation, under a theory of a moral duty on the part of those who reaped the benefits should pay the cost thereof. If a refund is made from the state treasury, Van Emmerik and all other citizens and utility consumers would have to contribute to make the payment through some additional tax—as a state must depend on its citizenry for funds. The end result, of sustaining Senate Bill 40 for a reasonable amount of time, would not be harsh or oppressive to anyone and public interest and common sense cries out, in this case, for validating the retroactive increase in tax on any refund ordered paid by the State.

Therefore, I would hold that Senate Bill 40, insofar as it provides that all taxes which must be refunded to the Utilities under SDCL 10–45–53, is a valid retroactive tax for the purpose of curing an oversight on the part of the legislature.

I would not, however, validate this tax back to the year 1969 for several reasons:

1. I am convinced that "there [must] exist a time period beyond which a statute may not constitutionally be given retroactive effect . . . ." *Martin*, supra, 140 A.2d at 297. A time limitation is absolutely necessary, "otherwise a legislature could constitutionally impose a new or increased tax retroactively for a period of 25 or 50 years which would be so onerous or confiscatory and unjust as to bankrupt the individuals or corporations thus taxed." *Martin*, supra, 140 A.2d at 298. There are ultimately some fixed time limitations which cannot be traversed.

No court, prior to the majority herein, has even approached the time frame of 10 years. It appears that a much more reasonable and shorter time has

been the limitation reached to this point. The majority would therefore be exceeding precedent by almost five times the maximum time approved to date. It seeks to evade the limitation of the *Martin* decision on the grounds that the present action is a "ratification" case and that the legislature is free to ratify the imposition of an increased tax just so long as it cannot be classified as a *new* tax which has already been collected back ad infinitum. Are we really prepared to say that the State taxing authorities can collect an increased tax for 10, 20, 50 or 100 years without legislative sanction and then have it ratified by retroactive legislation?

If so, the Bureau of Finance would be free to collect whatever *increased* taxes it deems the State needs, and an executive-dominated legislature need only meet every 10, 20, 50 or 100 years to ratify the Bureau's actions by retroactive legislation, as they are only "ratifying an increase of an existing tax which has already been imposed and collected." This is not the democratic way and might well lead to another Boston Tea Party.

I would propose that the increased tax be limited to that period of time needed to shield the State, to-wit: the statutory limitation in SDCL 10–45–53 of three years. Such a result would merely strain the time limits of prior decisions; to go further would shatter the concept of a reasonable time limitation and may launch us down a path which I am not prepared to tread.

2. We would be attempting to validate a tax for the sole purpose of obviating any liability of the Utilities to Van Emmerik for the years previous to 1976. This liability does not affect the State, due to SDCL 10–45–53, and has the obvious effect of granting a special immunity and privilege to the Utilities. The test, in such a case, is set out in *Matter of Certain Territorial Elec. Boundaries, Etc.*, 281 N.W.2d 65, 70 (S.D.1979) (emphasis added), where this court stated:

"[E]xclusivity is not in itself prohibited by art. III, § 23. The grant of special or exclusive privileges for private benefit *is* within the prohibition of the constitution. Grants of special or exclusive privileges, even those that are essentially monopolistic in character, are not, however, forbidden, *where the primary purpose of the grant is the promotion of the public interest and not the private benefit of the grantees.*" That is exactly what is done by any retroactive statute which goes beyond the time needed to protect the State from liability, to-wit: the benefits and primary purposes enure to the private benefit of the Utilities. Contrary to the majority holding, this legislation does not grant immunity to a "broad class" of retailers, but rather it grants immunity to a *single* class of retailers.

3. It does not involve the public policy considerations mentioned above, where the State would be refunding a tax and then proceeding to levy additional taxes to pay for the refund. The argument could be made that the same public interest applies to the taxes that the Utilities have collected and paid into the state treasury prior to 1976, as they will be forced to obtain a rate hike in order to pay a refund. However, the public interest is not so apparent and urgent.

In the case of the State refunds, the state treasury would be depleted at a time when the State is grasping for sufficient funds to operate ordinary functions of state government; secondly, it will have to go through the cumbersome administrative process of determining the amount due to countless unknown (to it) utility users; and finally, the state would have to propose a new tax to the legislature to pay a refund at a time when tax is a dirty word.

The Utilities on the other hand, having complete control of the list of utility users, can simply give credit for any

refund due and immediately impose and collect a rate hike to pay for it with an accompanying petition to the Public Utilities Commission (PUC) for validation. This is no different than the situation that the Utilities experience almost yearly when they impose and collect a rate hike of their own choosing, only to have it turned down or reduced by the PUC and later must give credit or a refund to their customers. The utility consumer would scarcely raise an eyebrow, as his utility bill generally reflects refunds on the last rate hike unilaterally imposed by the Utilities and not validated by the PUC and a new rate hike unilaterally imposed to more than cover the refunds ordered by the PUC in the last unsuccessful unilateral hike. Utility computers must already be set up for such an operation and it would be a "ho hum" problem for them, but it would be an *administrative* and *legislative nightmare* for the State.

4. This court should not validate a retroactive increase in tax going back 10 years and passed for the admitted purpose of shielding the Utilities from possible liability prior to 1976, as Van Emmerik's only possible present claim to a vested property right stems from the refunds ordered to be paid by the State to the Utilities. By further validation back to 1969, contrary to cited court precedent, we are only endangering a decision which is otherwise supportable under the facts and the controlling law.

I would hold that the retroactive increase in tax, covering the years for which the State is liable, is valid. I would hold that the retroactive increase in tax prior to that date where the State is absolved from liability under SDCL 10–45–53, is invalid.

HENDERSON, Justice (dissenting).

Senate Bill 40 offends Art. III, § 23, subdivision 9 of the South Dakota Constitution, which prohibits the Legislature from enacting any provision or special law granting to a corporation any special or exclusive privilege, immunity or franchise. The State of South Dakota is protected from any refund claims by the utility companies for any period of time prior to June 1, 1976. SDCL 10–45–53 explicitly so provides. Thus, permitting this tax law to be retroactively effective eleven and one-half years prior to its adoption grants the utility companies immunity from any legal action by their customers for excess charges imposed upon them. This appears to be a clear violation of our State Constitution. The majority opinion is unprecedented in the annals of American Jurisprudence. *See Comptroller of the Treasury v. Glenn C. Martin Company*, 216 Md. 235, 140 A.2d 288 (1958). The majority opinion simply fails to recognize that the State of South Dakota and the aggrieved consumers of electrical energy are in a far different legal posture.

Senate Bill 40 further offends Art. XI, § 2 of the South Dakota Constitution, which provides, inter alia:

Taxes shall be uniform on all property of the same class, and shall be levied and collected for public purposes only.

During oral argument before this Court, the Attorney General was questioned from the bench as to the reason for the additional eight and one-half years retroactivity. The Attorney General responded by stating that he thought what was fair, was fair; that is, the privately owned investor utilities should be shielded from liability in the same manner, and for the same time, as the State of South Dakota. The fair purport of his remarks clearly established that the reason for the deep reach back into history was to benefit these utility companies. It should be noted that he was the author of Senate Bill 40, and appeared before legislative committees in an effort to sell the bill, and was repeatedly seen on statewide television extolling the bill's merit. But the bottom line is this: The retroactive taxes imposed by Senate Bill 40 prior to June 1, 1976 (the limitation date beyond which no claim for refund against the state could be levied) was for the sole purpose of relieving the utility companies of a legal obligation to make restitution to affected electrical con-

sumers for excess charges illegally exacted from them. Obviously, this is not a public purpose and is therefore unconstitutional. *White Eagle Oil & Refining Co. v. Gunderson,* 48 S.D. 608, 205 N.W. 614 (1925).

Moreover, Senate Bill 40 appears unconstitutional when viewed in conjunction with Art. VI, § 12 of the South Dakota Constitution, which provides:

> No ex post facto law, or law impairing the obligation of contracts or working any irrevocable grant of privilege, franchise or immunity shall be passed.

Senate Bill 40 also violates the United States Constitution, Art. I, § 10, which expressly forbids any state to pass a law impairing the obligations of a contract. This Court has long recognized that legislative acts impairing contractual obligations are void. *Skinner v. Holt,* 9 S.D. 427, 69 N.W. 595 (1896). Affected consumers have a right to recover from a utility company any rate overcharges that were collected in violation of the law. *Cass Clay, Inc. v. Northwestern Public Service Company,* 63 F.R.D. 34 (D.S.D.1974). In the instant case, petitioner contracted with the utilities to be charged at the established legal rate, plus sales tax. Due to the utilities' eleven and one-half year failure to comply with SDCL 10–45–6, the contract between respondent utilities and petitioner was breached; thus, petitioner had a right to recover the excess charges. By retroactively applying Senate Bill 40 to canvas the entire duration of the utilities' breach, the majority opinion impairs an existing contractual obligation, which is blatantly inconsistent with the letter and spirit of our state's constitutional law.

I am simply amazed at the turnabout of this Court from its decisions in *Matter of the Appeal of the Sales Tax Refund Applications of Black Hills Power and Light Co.,* 298 N.W.2d 799 (S.D.1980), and *Van Emmerik v. State,* 298 N.W.2d 804 (S.D.1980). We held in those cases that there should be a determination of a credit or refund pursuant to the provisions of SDCL 10–45–53. According to that statute, the Commissioner of Revenue was to make that determina-

tion. It appeared that the Court had spoken, entered judgment, and a ministerial duty existed. However, the Commissioner of Revenue, himself an attorney general, did nothing to go forward with his judicially and statutorily determined duty. Therefore, the decisions of this Court were frustrated. Our decisions became mired in a lower court, to there linger and die. This does not appear to me to be in the best public interest.

Our decisions were then placed into the political arena. Senate Bill 40, through the intense lobbying of the executive branch, became law. In essence, its purpose is to make the illegal legal. It must, of necessity, pass constitutional muster. It does not, to the extent and for the reasons that I have expressed above.

I find the language of the majority decision and its reasoning to be in conflict with the language expressed in *Black Hills Power.* In *Black Hills Power,* we were adamant that the Legislature had, since 1969, intentionally granted a special sales tax concession to certain utility services. Therefore, I view the eleven and one-half year retroactive application of an additional one cent tax as an imposition of a new tax and not the curing of a "defect." The preamble to Senate Bill 40 recites a legislative finding that at all times since July 1, 1969, the Legislature intended to apply the same rate of tax to utility bills as was applicable to retail sales. This is in direct contradiction to this Court's construction of the applicable statutes in November, 1980. I place small credence in the preamble. It is a cover-up. As was recently stated:

> We have pointed out that a statement by present members of a legislative body, as to what their predecessors intended in a statute enacted several years previously, is not entitled to much weight.

*Washington National Arena Limited Partnership v. Treasurer, Prince George's County,* 287 Md. 38, 410 A.2d 1060, 1069, fn. 7 (1980). Now, the majority opinion states: "The unauthorized tax had been mistakenly collected without interruption since 1969[.]" Footnote 5 of the majority opin-

ion appears to be in direct conflict with our expressions in the next to the last full paragraph of *Black Hills Power.*

Constant reference has been made by the Governor's office and the Attorney General's office as to Senate Bill 40 being in the best public interest. Furthermore, the executive branch has publicly urged that this case be treated with immediate attention or South Dakota would face financial ruin. Senate Bill 40 was flaming legislation. I am opposed to fire engine justice to put out the flame. It is good for it to cool. In other words, I feel compelled to thoughtfully reflect upon the constitutionality of this act.

I believe that when two branches of government fuse, such as the executive and legislative branches, that the third branch, namely the judicial branch, owes an awesome duty to protect the State Constitution and the great doctrine of the separation of powers. And that is in the public interest.

Tax collectors should collect only that amount of tax which they are authorized to collect. And that is in the public interest.

Lastly, it is in the public interest that the officials of this state act within the bounds of law and not try to cover up their wrong by urging a greater wrong. The state should not be above the law anymore than any ordinary citizen. The Department of Revenue of this state apparently had knowledge of its wrongful excessive tax collection in May of 1977 when it was called to its attention that taxes were being collected in excess of the state law. Its hands are not clean.

I agree with Justice Dunn that a validation of Senate Bill 40 must be in the public interest. Can it be in the public interest for the Department of Revenue to knowingly flout a state law? I do not believe so. Arguments were heard in the Legislature and before this Court that the state needed the money and it could not afford to either refund the money to the people or give the people a credit. The state is essentially arguing that it has the right to keep the people's money so that government can operate. Fear of a ghost or phantom law to replace the lost revenue was used to pass Senate Bill 40. These are economic arguments, not legal arguments, and fly in the face of payment of a just obligation. The unlawful actions by the Department of Revenue in collecting sales tax at a rate greater than that imposed by the plain wording of the statue triggered this entire litigation.

At the risk of suffering the pundits of the intelligentsia, I am reminded of Luke 3:12–13, wherein John the Baptist stated upon being questioned by tax collectors: "Then came also publicans to be baptized, and said unto him, Master, what shall we do? And he said unto them, exact no more than that which is appointed you."