512 P.2d 73

Petition of Southwestern Public Service Company to Recover Taxes.

SOUTHWESTERN PUBLIC SERVICE COMPANY, Petitioner-Appellant,

v.

CHAVES COUNTY, New Mexico, Respondent-Appellee.

No. 9426.

Supreme Court of New Mexico.
July 13, 1973.

**314**

Hinkle, Bondurant, Cox & Easton, Paul W. Eaton, Jr., Paul J. Kelly, Jr., Roswell, for petitioner-appellant.

Patrick F. Hanagan, Dist. Atty., Gordon L. Gay, Roswell, for respondent-appellee.

## OPINION

STEPHENSON, Justice.

Petitioner-Appellant ("Southwestern") filed suit in Chaves County District Court pursuant to § 72–5–4, N.M.S.A.1953 for the recovery of certain property taxes paid under protest for the 1970 tax year. The case was tried to the court. After making its decision, the court entered judgment denying relief. Southwestern appealed.

Southwestern is a public utility, producing, transmitting and selling electrical current in Chaves County, other counties in New Mexico and in other states. In accordance with normal procedures it rendered its New Mexico properties to the State Tax Commission (now Property Appraisal Department, and hereafter called "P.A.D.").

In due course, P.A.D. certified values to the Chaves County Assessor. In this certification properties were classified as "real estate," "improvements" and "electric plant" with value figures opposite each. There is no issue regarding "real estate", "improvements" or any of the valuations. The controversy centers on "electric plant" the components of which we will detail presently.

In Chaves County are situated three special taxing districts, Pecos Valley Artesian Conservancy District (§ 75–13–1 et seq., N.M.S.A.1953); Rio Hondo Flood Control District and Rio Felix Flood Control District (§ 15–50–1 et seq., N.M.S.A.1953). Procedures were had to levy taxes in behalf of these taxing districts for 1970. It is these taxes that are the subject of this controversy.

Upon receiving the values from P.A.D., the assessor determined which of the properties listed were situated in the special taxing districts, and there is no controversy as to this. The assessor was only attempting to tax real property. He decided that, in addition to "real estate" and "improvements" the property listed as "electric plant" was also real estate, thereby precipitating this controversy. Southwestern was actually taxed on that basis which resulted in a marked increase in taxes in favor of the special taxing districts. Payment thereof was made under protest and this suit for recovery instituted.

Appellee points out in passing that under the statute which authorizes taxing for flood control districts, § 15–50–2, N.M.S.A.1953, "all the taxable property" may be taxed and that it does not matter whether "electric plant" is real or personal. Simi-

larly a parallel statute relative to artesian conservancy districts, § 75–13–19, N.M.S. A.1953 authorizes a tax on "all property", although appellee seems to concede that the Pecos Valley Artesian Conservancy District was organized under another act, the taxing statute of which (§ 75–30–41, N.M. S.A.1953) only permits tax levies to be made upon "real property within such district subject to general taxation for state and county purposes * * *."

▮ The question of whether the special taxing districts, or some of them, may tax personal property is not before us. The directors of the conservancy district set the taxing machinery in motion by resolving to levy on "all lands." The assessor did not intend to levy any tax on Southwestern's personalty. There was no intention, purpose or attempt to do so. The case does not seem to have been presented below on the theory that the taxing authorities had power to levy taxes on personalty in behalf of the special taxing districts, nor did the court arrive at its decision on that basis. To the contrary, it considered the disputed components of "electric plant" to be land "for the purposes of tax statutes." In fact, as to portions of "electric plant" which the court found to be personalty, taxes paid thereon by Southwestern were ordered refunded to it. There is no cross-appeal by the county, which will not be permitted to change its theory now. Hockett v. Winks, 82 N.M. 597, 485 P.2d 353 (1971); Pfleiderer v. City of Albuquerque, 75 N.M. 154, 402 P.2d 44 (1965).

Thus, the only issue before us is whether components of "electric plant" are taxable as real estate, which is to be determined by deciding whether they are actually real estate.

The property in question is equipment of various types used and useful, in fact essential, in Southwestern's business. None of it was annexed to any real estate, in the sense of being incorporated into it or so affixed that it could not be removed without extensive damage to the realty.

The first category we will consider has been referred to as "steam production" equipment, all situated on land owned by Southwestern, upon which it has been generating power for about fifty years. In this category are turbines and boilers, together with associated pumps and fans. Although there have been as many as six turbines and eleven boilers, there were three turbines and three boilers at the material time. The others had been dismantled and removed at various times for various reasons without damage to the building or equipment. The turbines and boilers sit on specially formed foundations not affixed to the foundation of the building and are secured by anchor bolts. The turbines are 20 feet long, 6 or 7 feet in diameter, and 6 or 7 feet high. They are quite heavy. The boilers are approximately 25 feet wide, 20 feet tall, 18 to 20 feet deep, and weigh between 18 and 20 tons.

Associated with the boilers are cooling towers which are 150 feet long, 40 feet wide and 20 or 25 feet high. Southwestern argues that they are replaced every five or six years, but what actually happens is that the boards or lathes deteriorate and are replaced as needed with a complete turnover estimated about every five or six years.

Also in the plant was a gas turbine similar to a jet aircraft engine, which was connected to a generator and used in peak load periods. It was placed upon, but not attached to, a foundation. It was 40 feet long, 12 feet wide, and 8 or 9 feet high. It could be loaded upon four railroad cars and was in this sense portable. It was quite heavy, but could be moved and used in another location if the need arose.

There is no evidence to indicate that any of the described production equipment has been moved since its installation nor how long any of it has been in its present position, except that the gas turbine was installed in 1962.

The classification of property as real estate or personalty historically has been a troublesome problem. An early New Mex-

ico case, Post v. Miles, 7 N.M. 317, 34 P. 586 (1893) citing Ewell on Fixtures stated three tests as to what constitutes a fixture. These were real or constructive annexation to the real estate, appropriation or adaptation to the use or purpose of that part of the realty with which it was connected, and the intention of the party making the annexation to make it permanent. It indicated that pre-eminence was to be given to intention, and laid down as a general rule that whatever, as between vendor and vendee, passes by deed of the premises without special enumeration, is a fixture. These tests have been consistently applied through our case law down to recent times. Patterson v. Chaney, 24 N.M. 156, 173 P. 859, 6 A.L.R. 90 (1918); Porter Lumber Co. v. Wade, 38 N.M. 333, 32 P.2d 819 (1934) (which quoting with approval from a text, indicated that the intention of the party making the annexation is a "controlling consideration" and "chief test"); Garrison General Tire Service, Inc. v. Montgomery, 75 N.M. 321, 404 P.2d 143 (1965) and Boone v. Smith, 79 N.M. 614, 447 P.2d 23 (1968). See also 35 Am.Jur.2d "Fixtures" § 14.

Thus our inquiry, though not disregarding annexation or adaptation, must center upon Southwestern's intentions in installing and maintaining the components of steam production in their present location. Indeed, annexation and adaptation are chiefly important as indications of intention.

In the case at bar, there was no evidence, oral or documentary, touching the issue of the actual or subjective intentions of Southwestern in respect to these units. This is the usual situation, at least in cases where special contractual relationships such as landlord-tenant, mortgagor-mortgagee or the like are not involved. The primary concern of the courts has been with objective or apparent intention rather than with the actual state of mind of the owner or installer of the equipment. This being so, courts naturally examine into the physical facts, history, use and legal relationships surrounding the item in question.

Appellee relies heavily on Southern California Tel. Co. v. State Board of Equalization, 12 Cal.2d 127, 82 P.2d 422 (1938), an instructive and well-reasoned case which is persuasive insofar as it is factually parallel. That was also a tax case involving the issue of whether certain items were real or personal property. The property in question was central office equipment installed in telephone exchanges. The Board of Equalization decided these facilities were fixtures which resulted in increased taxes. The California Supreme Court let that decision stand. The court was taking into account certain special California taxing statutes, but the factors considered are instructive.

In recognizing the importance of intention as a test, the court said:

"It is settled that in disputes between private persons the intention of the parties is controlling in determining whether an article is a fixture and part of the realty or is personalty. In M. P. Moller, Inc. v. Wilson, 8 Cal.2d 31, 37, 63 P.2d 818, 821, the rule is thus expressed: 'This court has recognized the test of intention to make the article a permanent addition to the realty as manifested by the physical facts, and has accepted the character of the annexation and the use for which the article is designed as subsidiary elements employed for the purpose of testing the intention of permanency. (Citations omitted). Thus whether an article is or was physically affixed to the building is only one of the criteria in determining whether there was an intention to make it a permanent accession to the real property.' "

Although the court stated the rule in terms of disputes between private persons it nevertheless proceeded to apply those tests in the tax case before it.

On the subject of intent the court said:

" * * * * [t]he 'intent' to which weight is given where rights of those who are not parties to any private agreement are concerned, is intent as mani-

fested by the physical facts, with due consideration to the status of the party by whom the articles have been installed."

In applying these tests the California court gave weight and consideration to the fact that the installations in question were situated in buildings owned by the telephone company and that most of the buildings had been specially designed for that purpose. Whether the buildings here are so specially designed does not specifically appear but they obviously are designed in such fashion as to contain these large items of equipment and from the fact that Southwestern has proven these articles may be removed through the doors without damage to the building it is inferable there is something special about the doors as well. In any case, the California court proceeded to consider that the articles in question were necessary or convenient to the use of the building for the purpose for which it was designed, saying that this feature tended to indicate the articles were realty. It indicated that the fact that the central office building was constructed for a special use favored permanence of location and attachment as fixtures, as did the dearth of other specially designed buildings. The court took into account the great expense incident to the moving of the equipment, either to another building or another place within the same building, features present here.

Using these criteria, we find here that the steam production equipment was installed on land owned by Southwestern. Special foundations were prepared to receive it. While the components can be moved without damage to the real estate, except perhaps in rendering the special foundations useless, so far as appears this has never occurred as to these particular units and there is nothing to indicate that it will or may occur in the foreseeable future. Southwestern argues that the trial court must have based its decision on the fact that these articles were large and heavy. Size and weight alone do not determine the legal question which confronts us, but these units are of a largeness and heaviness which is difficult to ignore. The moving of them would be an evolution of considerable magnitude and great expense, not to be lightly undertaken. Doubtless they will not be moved except for compelling business reasons. They are an integral part, in fact the very heart, of the phase of Southwestern's business which involves the manufacture of electric current.

The time may come when some or all of these articles may be moved, but in order for an article to become a fixture, as the California court phrased it, "Absolute permanence is not required." As used in this sense "permanent" need not be equated with "perpetual," "forever" or "until the end of time." Even a substantial building, undoubtedly real estate absent some controlling contractual relationship, is not permanent in that sense.

Also in the California case the court was required to consider whether certain articles such as head sets, stools and the like, wholly unattached, though specially designed for use in conjunction with the central office equipment, were real estate. On this subject it said:

"We are of the view that respondent's contention that the nonattached portions of the equipment and the attached portions together constitute a unit for use together and are improvements to realty, must be sustained. The detached portions of the equipment are constructively annexed. (Citations omitted)."

In this case the situation is even clearer as to the associated pumps and fans.

Gauged by all of these considerations we are not disposed to disturb the trial court's decision that the steam production equipment, together with its associated pumps and fans, was real estate.

We will next consider other types of equipment situate on land owned by Southwestern. This includes equipment utilized for the purpose of changing voltage in the transmission of power produced

in the plant. Southwestern maintains three transmission substations in Chaves County comprised of a transformer, together with associated switches to control voltage in and out of the transformers. The transformers are set upon a pad built to support them but are not bolted down. Transformers vary in size. Located with the transformers are oil circuit breakers, which are actually switches filled with oil. The oil circuit breakers are secured by anchor bolts, not to hold them to the pad, but rather to prevent them from moving about as they operate.

The transformers were changed quite frequently, sent to the factory for rewinding, transferred as the need arose, or moved to other locations.

Another category of property on land owned by Southwestern is distribution substations. This equipment steps down the voltage for distribution to the ultimate consumer. Southwestern has twenty-three such substations, comprised of transformers, oil circuit breakers, or switches very much akin to the transmission substations above referred to, although smaller. The transformers located in the distribution substations can be and are moved about as loads fluctuate. The transformers in both the transmission substations and distribution substations are placed on concrete pads primarily to keep them out of the dirt. The equipment located in the transmission substations was not anchored to the ground. It was merely fenced in. The various transformers are maintained as long as they are useful, and, as the area changes, the size of transformers will be increased or decreased, depending on demand.

We fail to see how it can reasonably be said that the transmission and distribution substation equipment was real estate. The equipment was readily portable and was frequently moved about for one reason or another. The annexation ranged from slight to none, the adaptation was non-existent. From these considerations and the totality of the surrounding circumstances,

we can infer no objective intention on the part of Southwestern that this equipment should be real estate. None of the tests and criteria we have discussed and relied upon in holding steam production equipment to be realty are present.

Appellee relies upon the Southern California Tel. Co. case in respect to the substation equipment, but it is simply not similar from a factual standpoint, however persuasive it may have been as to steam production equipment. In the California case the central office equipment was contained in and woven into owned buildings with as many as 180,000 wires. The ultimate holding of the California court was:

"The conclusion is inescapable that the complex mass of interconnected wires, cables, electrical and other equipment which is contained in a large central office serving many thousands of subscribers, as described and illustrated by photographs in this proceeding, constitutes together with the specially constructed building in which it is housed, and to which it is attached, a unit, which in its entirety is an improvement to realty. The fact that equipment is sometimes moved and office locations changed does not militate against this conclusion."

It must be apparent from our discussion of the California case that it cannot be stretched to mean that if units of a plant are simply connected with wires they are automatically real estate. Nothing comparable to the issue concerning transmission and distribution systems was before the court in the California case.

Appellee also places considerable reliance upon cases such as Appeal of Defense Plant Corporation, 350 Pa. 520, 39 A.2d 713. (1944). That case stands for the proposition that:

" 'Whether fast or loose, * * * all the machinery of a manufactory which is necessary to constitute it, and without which it would not be a manufactory at all, must pass for part of the freehold.' "

We are not called upon here to determine whether that rule applies in New

Mexico. A Pennsylvania statute made manufactories taxable as a whole. We have declined to disturb the trial court's decision that what might be equated to a manufactory, viz: the steam production equipment, was real estate. Moreover, Southwestern is not engaged merely in manufacturing current, but in transmitting and distributing it. Rather than all of the equipment being "necessary and essential to its (Southwestern's plant's) existence and operation as a manufacturing plant" the transmission and distribution system which we are now considering is scattered over a good deal of Chaves County. Would that system and equipment "pass for a part of the freehold" in event Southwestern should execute a deed to its "manufactory"? The question answers itself. Obviously it would not. The same test incidentally was considered by the California court and of course by this court in Post v. Miles, supra.

The trial court's decision that transmission and distribution substation equipment is real estate is reversed.

█ Finally, we consider the least troublesome of all of the facilities in issue—those located on easements, or, in any case, on land not owned by Southwestern. Actually some of the distribution substations are so situated.

Included in equipment installed on land not owned by Southwestern are poles and appurtenances, which include transmission lines carrying the power from one location or area to another. The transmission lines, are, at intervals, supported by two poles and a cross-arm. The poles are placed in holes and dirt is tamped around them. These poles are relocated for highway rebuilding and due to improvements being built nearby. The transmission lines, including poles, are located on easements and public right-of-way. Also in this category are poles and wires in streets and alleys that bring the power to the customers' property. These are also located on easements and franchised streets and alleys.

They are relocated quite often for various reasons. Attached to poles are line transformers used to step voltage down to that actually used by most customers. Line transformers are twelve to thirty-six inches in diameter and are attached to the pole by two bolts and changed quite frequently. Another type of installation is the wire that runs from the pole to the customer's house and which is readily removable. Located on land owned by the consumer are electric meters which are plugged into a socket located on the customer's house. These meters are removed by simply loosening a screw, removing a retaining ring, and unplugging the meter. Replacing overhead wires in some areas are underground conduit, conductors and devices. These items consist of plastic tubing placed in the ground and a wire runs through the tube to the customer's premises. All such installations are located on easements or premises of the users. Another category contained within the distribution system consists of yard lights mounted upon a pole to which a wire is run. These are placed on the customer's property and removed at his request. Street lighting, comprised of street lights and traffic lights, is also a portion of the distribution system located entirely upon public rights-of-way. These items are placed and removed at the request of the municipality.

We have little hesitation in holding that the articles of equipment situated on lands not owned by Southwestern are not real estate.

In addition to what we have said about the transmission and distribution substations which applies with equal force, we have here the additional concept that if Southwestern intended that equipment installed on unowned real estate was to become part of that real estate, under general law they would be parting with the title to it. It might even flee from Southwestern's rate base. There is nothing before us, either of a subjective or objective nature to indicate that Southwestern had any such extraordinary intention.

It is interesting to note that in the California case the court held, without discussion, that central office equipment installed, in leased structures, was not real estate, saying:

"In no proper sense can equipment in small leased offices be held an improvement to and part of real property owned by another. The mere attachment of switch board legs and equipment to floor or walls by screws or bolts does not have that effect."

The trial court's decision in respect to equipment installed on real estate not owned by Southwestern is reversed.

The action of the trial court having been affirmed in part and reversed in part, the case is remanded for further proceedings consistent with the views expressed in this opinion.

It is so ordered.

McMANUS, C. J., and OMAN, J., concur.