**BRINK ELECTRIC CONSTRUCTION COMPANY, Appellant,**

v.

**STATE of South Dakota, DEPARTMENT OF REVENUE, Appellee.**

**No. 17026.**

Supreme Court of South Dakota.

Argued Oct. 22, 1990.

Decided June 26, 1991.

Robert A. Warder, Hill City, for appellant.

John Dewell, Asst. Atty. Gen., Pierre, for appellee; Roger A. Tellinghuisen, Atty. Gen., on brief.

KONENKAMP, Circuit Judge.

Brink Electric Construction Company (Brink) appeals from a judgment dismissing its complaint seeking declaratory relief from contractors' excise tax and use tax imposed in connection with three fixed price construction contracts it performed for the United States. We affirm.

Brink entered into two contracts with the Western Area Power Administration (WAPA), an agency of the United States Department of Energy, and one with the Department of Defense. We describe these contracts in detail below, because the nature of the work performed bears directly on the questions presented here.

Maurine Substation: A contract for replacing equipment and constructing an addition to an electrical substation near Maurine, South Dakota, dated January 9, 1987. The forward to the specifications provided:

> The work includes regrading and extending the existing yard and providing electrical equipment for the 230–kV/115–kV interconnection with associated concrete foundations and cable trench; steel structures; metering, relaying, and control equipment; bus systems; and grounding, conduit and insulated cable. The work also includes reroofing and painting the service building.

Ellsworth Air Force Base: A contract awarded August 10, 1987, for repair and replacement of primary electric cable at Ellsworth Air Force Base. The contract provided:

> The work consists of trenching, pushing under roadways, installing manholes and duct lines, setting pad mounted transformers, pulling in primary and secondary cable, and making high voltage connections. The contractor must set poles, change out overhead transformers, run overhead primary, convert service entrances, and install pole top switches and metering assemblies.

Flandreau Substation: A contract for building an electrical substation near Flandreau, South Dakota, awarded May 19, 1988. The last bid solicitation was March 3, 1988, with a bid opening on March 22, 1988. The specifications summarized the work as follows:

> The work includes removing concrete foundations, steel structures, existing service building, chain link and barbed wire fencing. Clearing, stripping, and excavation for substation site and access road; corrugated metal and corrugated polyethylene pipe; foundations for steel structures, electrical equipment, and service building; cable trenches; galvanized welded steel structures and modifying existing steel structures; Western-furnished power circuit breakers, duplex switchboard sections, and station battery system; furnishing and installing disconnecting switches, fuse-disconnecting switches; voltage transformers, outdoor slip-over bushing-type current transformers, coupling capacitor voltage transformers, and surge arresters; station service distribution transformer, outdoor AC distribution panelboards, and manual transfer switch; grounding system, conduit, insulated conductors and cables, bus system, substation lighting and substation signs, and indoor dc and ac distribution panelboards. 28 ft. × 50 ft. service building.

Brink did not include contractors' excise tax in its bids, because it believed the tax was inapplicable to contracts with the Federal Government. Brink contends that contractors' excise tax may have been applicable to such contracts between 1979 and 1984, but the South Dakota Legislature excluded contracts with the United States in 1984, and then in 1988 re-established the tax on such contracts making it retroactive to 1984.

## I. DOES THE 1988 AMENDMENT TO SOUTH DAKOTA'S CONTRACTORS' EXCISE TAX LAW HAVE AN IMPERMISSIBLY RETROACTIVE EFFECT?

In 1979 the South Dakota Legislature created a contractors' excise tax on the gross receipts of "Prime contractors and subcontractors engaged in realty improvements contracts...." SDCL 10–46A–2. Since then the Department of Revenue (Department) regularly sent licensees and applicants for licenses bulletins and newsletters, outlining their obligations under this law. Brink obtained its tax license from the Department in 1979.

In 1984 the legislature amended these tax laws in an enactment entitled "An Act to exempt subcontractors from the contractors' excise tax, to increase the tax rate, to exempt certain utility construction contracts and to declare an emergency." 1984 S.D. Session Laws Ch. 92, § 7. Among other things, prime contractors were redefined: "For the purpose of this chapter, a prime contractor is a person entering into a realty improvement contract with *another person* as defined in § 2–14–2.... (emphasis added). SDCL 10–46A–2.2. SDCL 2–14–2(16) defines person as follows: " 'Person' includes natural persons, partnerships, associations, and corporations...."

In 1988 the legislature in an amendment entitled in part "an act to revise the definition of person" changed SDCL 10–46A–2.2 to delete the phrase "another person as defined in § 2–14–2" and replaced it with the following:

> For the purpose of this chapter, a prime contractor is a person entering into a realty improvement contract with the *United States and its instrumentalities,* the state of South Dakota and its subdivisions, or any other state or public corporation, or person as defined in Section 10–45–1. (emphasis added).

1988 S.D. Session Laws Ch. 120, § 3. The 1988 amendment contained an emergency clause making it effective on February 29, 1988 and, in addition, made it applicable to all realty improvement contracts bid or entered into after April 30, 1984, which was the applicable date for the 1984 enactment. 1988 S.D. Session Laws Ch. 120, §§ 4, 5.

The original 1979 enactment made no specific reference to government contracts;

it simply made no distinction between private or public entities. In 1984, however, the legislature introduced the term "another person" in detailing what types of contracts the tax applied to. Brink argues that the 1984 amendment intended to exempt from excise tax, prime contractors performing work for the United States, because the Federal Government is not a person. To correct this apparent oversight, the legislature in 1988 revised the statute to include specifically contracts with the United States. Brink argues that by making the 1988 amendment applicable to contracts bid or entered into after April 30, 1984, the effect was to impose retroactively a tax where none had existed for four years.

The Department contends that the 1984 amendment never excluded contracts with federal agencies, because the statute defining "person" used the word "including." We have held before that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle". *Argo Oil Corporation v. Lathrop*, 76 S.D. 70, 72 N.W.2d 431, 434 (1955), *quoting Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 96, 62 S.Ct. 1, 4, 86 L.Ed. 65, 70 (1941). "It is hornbook law that the use of the word 'including' indicates that the specified list ... is illustrative, not exclusive." *Puerto Rico Maritime Shipping Authority v. I.C.C.*, 645 F.2d 1102, 1112, n. 26 (D.C.Cir.1981); *contra Schauf v. City of New York*, 23 Misc.2d 585, 198 N.Y.S.2d 435 (1960).

Can the term "including" expand the definition of person to encompass governments? Corporations, partnerships and associations have traditionally been categorized as persons for legal purposes, but the words "person or corporation" do not ordinarily mean a sovereign government. *Southern Union Gas Co. v. New Mexico Pub. Serv. Com'n*, 82 N.M. 405, 482 P.2d 913 (1971). Congress has by statute either included or excluded governments in its definition of the word. *See, e.g.*, 15 U.S.C. § 77b(2) ("Person" means a government or political subdivision thereof); 11 U.S.C. § 101(30) ("Person" does not include a gov-

ernmental unit). Likewise, if South Dakota had wanted to include contracts with government agencies in the excise tax laws, it could have easily done so. The legislature specifically included government entities in other tax laws. *See, e.g.*, SDCL 10–46–1(8) (Use tax: "Person" includes the state and municipal corporations. Repealed in 1987); SDCL 10–45–1(3) (Sales tax: "Person" includes municipal corporations.)

> The failure to include the United States and the states in the definition could not have been inadvertent. The United States and the several states of the Union are not persons, and are not commonly thought of as persons, and if it had been intended that "persons" should have such a comprehensive and unusual meaning as to include them, the framers of the definition would have said so.

*Davis v. Pringle*, 1 F.2d 860, 863 (4th Cir. 1924).

Yet no absolute rule of exclusion exists. A different interpretation may, as Justice Frankfurter wrote, be

> drawn from the structure of the Act, its legislative history, the practice under it, and the past judicial expressions.... Whether the word "person" or "corporation" includes a State or the United States depends upon its legislative environment. *Ohio v. Helvering*, 292 U.S. 360, 370, 78 L ed 1307, 1310, 54 S Ct 725 [727]. The Cooper Corp. Case recognized that "there is no hard and fast rule of exclusion. The purpose, the subject matter, the context, the legislative history, and the *executive interpretation* of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law." [*U.S. v. Cooper Corporation*] 312 U.S. at [600] 604, 605, 85 L ed 1074, 1075, 61 S Ct 742 [743, 744]. (emphasis added).

*Georgia v. Evans*, 316 U.S. 159, 161, 62 S.Ct. 972, 973, 86 L.Ed. 1346 (1942).

The Department argues that the legislative intent in 1984 was not to exclude con-

tractors doing business with the Federal Government. The trial court reasoned that the removal of the excise tax from all contracts involving state and federal entities would have been a significant change in the excise tax statutes in 1984. The title of the 1984 amendment, however, does not reflect that the Legislature intended that result.

"The intention of the Legislature is to be ascertained by the court primarily from the language used in the statute, with the aid of the canons of construction." *Argo Oil Corp., supra* 72 N.W.2d at 434. Nothing in the 1984 amendment suggests an intent to impliedly repeal the original 1979 enactment's applicability to federal contracts.

The familiar principle that repeal will not be implied unless there is a positive repugnancy between the provisions of the new law and those of the old has most appropriate application ... to the interpretation of the laws for the collection of revenue.... (citations omitted).

*Graham v. Goodcell*, 282 U.S. 409, 425, 51 S.Ct. 186, 192, 75 L.Ed. 415, 438 (1931). Brink insists that if the 1984 amendment did not exempt federal contracts, there would have been no need for the 1988 amendment. The 1988 legislature obviously saw a necessity to clarify the 1984 amendment: It revised the statute to include the United States and made it retroactive to April 30, 1984. Yet we do not deem this a concession that the 1984 amendment repealed the law's applicability to federal contracts. On the contrary, all the available evidence suggests that the "legislative environment" in 1984 was to continue taxing prime contractors performing federal contracts and any indication otherwise was inadvertent.

From 1979 through both the 1984 and 1988 amendments, the Department interpreted the law to include prime contractors performing realty improvement contracts for state and federal entities. The trial court held:

There is no dispute that from 1979 to 1988 the Department consistently taxed the gross receipts of prime contractors' contracts with state and Federal Government. The Department also routinely issued informational bulletins to all licensed contractors, including Brink, from 1979 to the present. These bulletins consistently indicated that the prime contractors performing realty improvement contracts with state and Federal Government entities were subject to contractors' excise tax.

The Department's interpretation, although not dispositive, aids our construction of the 1984 amendment; more importantly, it put all contractors on notice that contracts with government agencies could be subject to excise tax. *Georgia v. Evans, supra.*

We conclude that although the legislature did not intend to exclude contracts with federal agencies, the effect of the 1984 amendment left uncertain whether excise tax applied to these contracts. Now the question becomes, did the 1988 amendment which clarified the law retroactively, transgress constitutional limitations?

We held in *State Ex Rel. Van Emmerik v. Janklow*, 304 N.W.2d 700, 705 (S.D.1981)

no precise guidelines exist that state with certainty when a particular retroactive tax law can be upheld. In each case, "it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation."

*Quoting Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87, 93 (1938). The United States Supreme Court reiterated three tests for determining whether a retroactive tax is so harsh and oppressive as to constitute a denial of due process:

[N]amely, whether the taxpayer could have altered his behavior to avoid the tax if it could have been anticipated by him at the time the transaction was effected; whether the taxpayer had notice of the tax when he engaged in the transaction; and whether the tax is a new tax and not merely an increase in the rate of an existing ... tax.

*United States v. Darusmont,* 449 U.S. 292, 299, 101 S.Ct. 549, 553, 66 L.Ed.2d 513, 519 (1981).

Did Brink have notice of the tax when it engaged in the contracts? The Department regularly sent rulings and bulletins to all licensees, including Brink, reminding them of their obligation to pay this tax. Brink argues that these notices merely referred to contracts with "government agencies" rather than federal instrumentalities. Yet Brink made no further inquiry of the Department and sought no legal advice on the question. Of course, the Department's erroneous belief does not create a tax where none existed. Department's notice to contractors, nonetheless bears on the question of whether the retroactive tax was "so harsh and oppressive as to transgress the constitutional limitation." *Welch v. Henry,* 305 U.S. at 147, 59 S.Ct. at 125. Brink was on notice to at least make further inquiry, but it chose to do nothing.*

Could Brink have altered its behavior to avoid the tax if it could have anticipated it at the time it entered the contracts? Brink could not have avoided the tax, but it concedes that it could have included the tax in its bids and passed it on to the federal agencies it contracted with, if it had been aware that excise tax was applicable to these transactions.

Was the contractors' excise tax a new tax or merely an increase in rates? Without doubt contractors' excise tax applied to contracts with federal agencies from 1979; its continued applicability to those contracts after 1984 was an open question. The trial court decided that the 1988 amendment was merely curative legislation designed to remove ambiguities raised by the 1984 amendment. We agree. *See Van Emmerik, supra; Oto County v. Baldwin,* 111 U.S. 1, 4 S.Ct. 265, 28 L.Ed. 331 (1884). Although the 1988 amendment retroactively clarified the 1984 amendment, it was not so harsh or burdensome as to transgress constitutional limitations.

## II. DID THE THREE CONSTRUCTION CONTRACTS CONSTITUTE REALTY IMPROVEMENT CONTRACTS UNDER SDCL 10–46A–1?

■ Contractors' excise tax is imposed on the gross receipts from "realty improvement contracts." Brink argues that the electrical equipment it installed as part of its contracts was not a realty improvement, because the equipment did not become fixtures. The equipment was designed and installed so that it could be removed, replaced or reinstalled at another location as needs changed. Transformers rested on concrete pads, but were not fastened down. Circuit breakers were held to the pads with nuts and bolts. All the installed equipment could be removed within hours.

We held in *Matter of Diagnostic Medical Systems,* 415 N.W.2d 816 (S.D.1987) that certain diagnostic medical equipment was not subject to contractors' excise tax as a realty improvement because such equipment was not a "fixture" when installed in a hospital or diagnostic medical facility. In deciding whether an article is a fixture, we consider the following:

(1) annexation to the realty; either actual or constructive; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation ... The intention of the party with regard to making the article a permanent accession to the realty is the controlling criterion.... The other tests derive their chief value as evidence of such intention.... Intention is deduced from the relation of the parties and the circumstances of a particular case....

*Matter of Tax Appeal of Logan and Associates,* 331 N.W.2d 281, 282–283 (S.D.1983).

Brink contends that *Diagnostic Medical Systems* is controlling here, thus items it installed were not realty improvements because these components: (1) could be moved if changes were required at the substation and removal would not injure the equipment or the real estate; (2) could be replaced during their useful life; (3) had

---

* We note also that Brink's bid on the Flandreau Substation was opened on March 22, 1988, three weeks after the 1988 amendment went into effect.

a recognized secondary market; (4) were not contained in a specially constructed building; (5) were affixed to the ground by bolts mounted in concrete slabs (except the large transformer) and could easily be removed with a wrench; and (6) were treated as depreciable personal property under the Internal Revenue Code.

The equipment in question was designed for electrical substations and most of it was bolted to concrete slabs specially designed for each piece of equipment. Brink constructed the slabs as part of its contracts. The automatic transformer, although not attached to a slab upon which it rested, weighed approximately two hundred tons. Brink argues that the transformers it installed were merely larger versions of that commonly seen on power poles on streets and alleys, and the circuit breakers likewise were larger versions of those installed in residential homes. The trial court reasoned that "whether installed in homes, on power poles or at a substation site, this equipment is 'placed upon [the land] to promote the use for which the realty has been put.'" *See Dakota Harvestore Systems v. S.D. Dept. of Revenue,* 331 N.W.2d 828, 830 (S.D.1983).

Brink also relies on the case of *Southwestern Public Service Co. v. Chaves County,* 85 N.M. 313, 512 P.2d 73 (1973). There the New Mexico Supreme Court found that certain distribution and transmission substation equipment and items located on easements were not fixtures subject to real estate tax. After applying the traditional tests for deciding whether an item is a fixture, the New Mexico Supreme Court stated

We fail to see how it can reasonably be said that the transmission and distribution substation equipment was real estate. The equipment was readily portable and was frequently moved about for one reason or another. The annexation ranged from slight to none, the adaptation was non-existent. From these considerations and the totality of the surrounding circumstances, we can infer no objective intention on the part of Southwestern that this equipment should be real estate.

*Southwestern,* 85 N.M. at 318, 512 P.2d at 78. The equipment the court referred to was

comprised of a transformer, together with associated switches to control voltage in and out of the transformers. The transformers are set upon a pad built to support them but are not bolted down. Transformers vary in size. Located with the transformers are oil circuit breakers, which are actually switches filled with oil. The oil circuit breakers are secured by anchor bolts, not to hold them to the pad, but rather to prevent them from moving about as they operate.

The transformers were changed quite frequently, sent to the factory for rewinding, transferred as the need arose, or moved to other locations.

*Id.* 85 N.M. at 318, 512 P.2d at 78.

We see a clear distinction between that case and the present one. In *Southwestern* the issue was whether individual components were subject to real estate tax. Here we are dealing with taxing gross receipts of realty improvement contracts, which are not broken into constituent parts for tax purposes. Brink's installation of electrical equipment was only a part of the three projects. Cf. *In Matter of Diagnostic Medical Systems, supra.* Besides supplying and installing equipment, the contracts included grading, embankment construction, trenching, creation of reinforced concrete foundations, demolition and foundation removal, repairs, removal of old equipment and materials, erection of steel structures, construction of transmission lines and reroofing a service building and building modifications. Under all three contracts the overall work improved the realty for electrical transmission purposes.

Furthermore, the equipment in *Southwestern* was "readily portable and frequently moved about for one reason or another." Here the equipment could be moved, but frequent movement was not contemplated unless replacement was necessary. In this sense, the installations were permanent.

The permanence required is not equated with perpetuity. It is sufficient if the item is intended to remain where affixed until worn out, until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose.

*Matter of Tax Appeal of Logan and Associates, supra* at 283.

Considering the contracts in their entirety, each was a realty improvement contract subject to contractors' excise tax.

## III. DOES SOUTH DAKOTA UNCONSTITUTIONALLY SINGLE OUT PERSONS WHO DEAL WITH THE UNITED STATES AS AN ELECTRICITY SUPPLIER FOR A HIGHER TAX RATE?

Brink argues that South Dakota imposes a higher tax rate on the Federal Government through its agency, WAPA, than any other electricity supplier. A lower rate applies to contracts enumerated in SDCL 10–46B–1 which includes railroads, telephone companies, telegraph companies, public utilities, rural electric companies, rural water supply companies, and municipal utility and telephone companies. A state taxation scheme may not discriminate against the Federal Government or those with whom the government deals. *Phillips Chemical Co. v. Dumas School Dist.*, 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960); *see also Washington v. United States*, 460 U.S. 536, 103 S.Ct. 1344, 75 L.Ed.2d 264 (1983).

Brink's grievance focuses on the difference in rates between SDCL 10–46A, Contractors' Excise Tax (2%), and SDCL 10–46B, Alternate Contractors' Excise Tax (1½%), applicable to contracts with qualifying utilities. It is important to note, however, that under SDCL 10–46A only a prime contractor is taxed at the two percent rate; subcontractors do not pay the excise tax. Under SDCL 10–46B, on the other hand, both prime contractors and subcontractors pay one and one-half percent excise tax on their gross receipts. Therefore, under certain circumstances, the

tax imposed on realty improvements for qualifying utilities may be higher than that imposed on contracts with South Dakota or the Federal Government.

Moreover, contractors doing business with the State of South Dakota are liable under SDCL 10–46A for two percent excise tax since none of the qualifying utilities listed in SDCL 10–46B–1 have any relationship with the State. Contractors dealing with the State stand in the same position as those who deal with the Federal Government. "[I]t does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself." *Phillips Chemical Co.*, 361 U.S. at 385, 80 S.Ct. at 480.

In *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 526, 79 S.Ct. 437, 440, 3 L.Ed.2d 480, 484 (1959), the Court wrote

The states have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or maintain a precise, scientific uniformity with reference to composition, use or value. (citations omitted). "To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our Government and wholly beyond the protection which the general clause

of the Fourteenth Amendment was intended to assure." (citation omitted).

The *Allied* court further held

a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it.

*Allied Stores of Ohio v. Bowers,* 358 U.S. at 528, 79 S.Ct. at 441.

The trial court found that Brink had failed to demonstrate that the excise tax structure singles out those who deal with federal power agencies for a heavier tax burden than other similarly situated contractors. In so ruling the trial court stated

This state's excise tax structure is broad and complex. The mere fact that a scenario can be developed where the excise tax liability of a contractor engaged in a realty improvement contract with a federal agency distributing electricity may be more than that of a contractor dealing with a similarly situated private or municipal utility is not sufficient to overcome the presumption of constitutionality.

"[T]he State's power to classify is, indeed, extremely broad, and its discretion is limited only by constitutional rights and by the doctrine that a classification may not be palpably arbitrary." *Phillips,* 361 U.S. at 385, 80 S.Ct. at 480. After carefully considering South Dakota's excise tax scheme, we see nothing "palpably arbitrary" in classifying contracts with certain enumerated utilities for a different rate.

IV. IS THE USE TAX IMPOSED BY SDCL 10–46A–5 APPLICABLE TO PROPERTY FURNISHED BY THE UNITED STATES GOVERNMENT TO BRINK WHICH BRINK INSTALLED IN PERFORMANCE OF ITS CONTRACTS WITH THE GOVERNMENT?

■ Brink contends that the state may not impose use tax under SDCL 10–46 on government-owned property furnished to Brink to be used for its contracts on government installations. Brink says that the materials were not "used" within the meaning of SDCL 10–46–1(2) and 10–46–5. We have previously held that even if government-owned materials are furnished to a contractor for incorporation into a government project, the materials are "used" within the meaning of those statutes and the contractor is subject to use tax on the value of the government-furnished property. *Friessen Const. Co., Inc. v. Erickson,* 90 S.D. 60, 238 N.W.2d 278 (1976). This reasoning has withstood later scrutiny by the United States Supreme Court in other jurisdictions. *See, e.g., United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982).

Brink nonetheless argues that since some government-furnished materials were installed under the supervision of the manufacturer, the materials are not subject to the use tax. "[A] use tax may be valid only to the extent that it reaches the contractor's interest in Government-owned property...." *United States v. New Mexico,* 102 S.Ct. at 1386, n. 14. Brink installed these materials and was paid for such installation; therefore, it used the materials within the meaning of the statute. *See United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958).

V. DOES SOUTH DAKOTA'S TAXATION SCHEME IMPERMISSIBLY BURDEN INTERSTATE COMMERCE?

■ In deciding whether a state's tax scheme burdens interstate commerce the United States Supreme Court employs a four part test: Whether the tax (1) is applied to an activity with a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state. Complete *Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

Brink argues this test has not been met because there is no nexus between South Dakota and the subject matter of these contracts other than the happenstance that the substations in question, and Ellsworth

Air Force Base, are physically located within this State. We conclude otherwise; the test clearly shows that the tax does not burden interstate commerce. First, a substantial nexus existed, since the construction took place entirely within South Dakota. Second, the tax was fairly apportioned because no other state could tax the gross receipts of contracts performed entirely within this State. Third, the tax did not discriminate against interstate commerce. Brink's work dealt with building substations for the transmission of electricity, not the actual transmission of electricity, which took place after the construction was completed. Fourth, the tax was in proper proportion to the "consequent enjoyment of the opportunities and protections which the state has afforded" in connection with those activities. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 626, 101 S.Ct. 2946, 2958, 69 L.Ed.2d 884, 900 (1981).

The trial court found that Brink had introduced no evidence tending to show that excise or use taxation on the proceeds of Brink's real estate construction activities in South Dakota had any effect on the interstate transmission of electricity. We concur.

Affirmed.

MILLER, C.J., and SABERS, J., and MORGAN, Retired J., concur.

WUEST, J., concurs specially.

KONENKAMP, Circuit Judge, for HENDERSON, J., disqualified.

AMUNDSON, J., not having been a member of the Court at the time this action was submitted did not participate.

WUEST, Justice (concurring specially).

I concur in this opinion but would not reach the retroactive tax issue. In my opinion, the 1984 amendment did not exempt federal contracts and the 1988 amendment merely clarified it.